J-S79017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.K.K., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: P.K.K. A/K/A P.K., FATHER | : | |
| | : | |
| | : | |
| | : | No. 1933 EDA 2017 |

Appeal from the Order Entered May 23, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000668-2014,
CP-51-DP-0000993-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: J.Z.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: P.K.K. A/K/A P.K., FATHER | : | |
| | : | |
| | : | |
| | : | No. 1934 EDA 2017 |

Appeal from the Order Entered May 23, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000669-2014,
CP-51-DP-0000994-2013

BEFORE:  GANTMAN, P.J., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.:                **FILED DECEMBER 18, 2017**

P.K.K. (a/k/a P.K.) ("Father") appeals from the trial court's orders[1] involuntarily terminating his parental rights to his minor children, P.K.K., Jr. (born 7/2008), and J.Z.K (born 3/2010), (collectively, "Children").[2] After careful review, we affirm. Father simply has not demonstrated a willingness or capacity to undertake a parental role for Children which would provide the safety and permanency they so desperately need.

On May 11, 2013, the Philadelphia Department of Human Services ("DHS") received a report that Mother was wandering the streets with Children while she was high on "wet," a combination of PCP and marijuana. Because no other kin were identified, Children were taken into police custody and placed at a temporary residence. When Mother was unable to locate a viable placement for Children, DHS obtained a temporary foster home for them. Authorities later determined that Father was incarcerated on drug charges.

After an adjudicatory hearing held on May 21, 2013, Children were adjudicated dependent, committed to DHS, and placed in foster care. Mother was given a Family Service Plan ("FSP") that consisted of continuing treatment, complying with scheduled appointments with the Clinical

---

[1] Father filed two separate appeals at Nos. 1933 and 1934 EDA 2017 from the orders terminating his parental rights to Children. On July 11, 2017, our Court *sua sponte* consolidated these appeals. **See** Pa.R.A.P. 513.

[2] Mother's rights to Children were involuntarily terminated on March 7, 2016; she filed a *pro se* appeal from that order. On January 9, 2017, our Court affirmed the trial court's decree terminating her parental rights. **In re P.K.K., Jr. & J.Z.K.,** 1151 EDA 2016 (Pa. Super. filed Jan. 9, 2017) (memorandum decision).

Evaluation Unit ("CEU"), and drug screening and monitoring. When Mother was non-compliant with her FSP goals and tested positive for drugs (PCP and marijuana), the court ordered that legal custody remain with DHS and that Children remain in foster care. The court also granted Father supervised visits with Children at Hoffman Hall, a halfway house, as arranged by the parties.

In May 2014, Father was given the following FSP objectives: locate adequate housing with suitable space, heat and working utilities; comply with drug and alcohol services; receive drug and alcohol assessments from the Clinical Evaluation Unit; keep and maintain regular contact with Children, meet regularly with social workers and follow through with FSP, and receive random drug screens. In June 2014, Father was permitted unsupervised day visits in the community as arranged by the parties; Father was on probation at the time for his prior drug conviction. Father continued to test positive at drug screens and was developing a pattern of missing P.K.K., Jr.'s therapy appointments. In September 2014, the court modified Father's visits with Children to supervised. In December 2014, Father was ordered to begin parent-child interaction therapy. In March 2015, the court found that Father's home was not suitable for Children and determined that Father was minimally compliant with his permanency goals and non-compliant with his FSP.

At the time of the next permanency review hearing in June 2015, Father was incarcerated. On March 7, 2016, the court held a goal change/permanency review hearing, at which time Mother's parental rights were terminated. The court also determined that it was "not prepared to

terminate [F]ather's rights at th[at] point . . . and ordered that a bonding evaluation occur." N.T. Hearing, 3/7/16, at 40. On November 22, 2016, DHS filed a petition to involuntarily terminate Father's parental rights to Children. After a full hearing on DHS's petition, the trial court entered a decree on May 23, 2017, terminating Father's rights to Children under sections 2511(a)(1), (a)(2)[3] and (b) of the Adoption Act.[4] At the hearing, the court noted that "[F]ather has no credibility before the Court [and] all of his testimony must be viewed in that light," N.T. Termination Hearing, 5/23/7, at 87; however, the court "credit[ed] [caseworker, Burr's] testimony and g[a]ve it great weight [as well as the testimony of] Dr. Williams[, who provided] both the parenting capacity evaluation and the bonding evaluation." *Id.* at 87-88.

Father simultaneously filed a timely notice of appeal and Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal. Father presents the following issues for our consideration:

(1)     Did the Court below err in terminating Father's parental rights even though he had fairly consistent weekly visits and with [his] children and the visits were appropriate?

(2)     Did the Court below err in terminating Father's parental rights due to the fact that Father had appropriate housing?

---

[3] We can affirm the trial court's decision regarding the termination of parental rights with regard to any singular subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

[4] 23 Pa.C.S. §§ 2101-2910.

> (3) Did the Court below err in terminating Father's parental rights because Father was in [Drug and Alcohol] treatment[?][5]

Father's Brief, at 3.

Father argues that the court did not have legal grounds to terminate his parental rights to Children where he "had met his FSP goals of visits, housing drug and alcohol treatment, anger management and parenting." Father's Brief, at 5.

The argument section of Father's brief is one page in length. He states that termination was improper where Community Umbrella Agency ("CUA") case manager, Jared Burr, indicated Father: had completed anger management and parenting classes while incarcerated; had been compliant with substance abuse treatment; and had completed therapy with P.K.K., Jr. at Joseph J. Peters Institute. *Id.* at 10. Father also claims that due to an unfounded abuse allegation against him, his visits with Children were suspended and never reinstated. Father contends that mental health referrals that were indicated were never made for him, that he was an excellent participant in group and individual therapy sessions, and that there is a bond between him and Children.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined

_____

[5] All three of Father's issues can essentially be condensed into one inquiry, whether the court properly terminated his parental rights where he visited Children fairly consistently, had appropriate housing and was in drug and alcohol treatment.

as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

We recognize that in the certified record there are two letters, dated March and May 2017, from a therapist at Sobriety Through Out Patient, Inc. ("STOP") indicating that Father has been attending his group and individual therapy sessions without fail since January, and that he had continued to maintain sobriety throughout his admission to the program. While the therapist notes that Father's prognosis is great, he qualifies this statement by noting his progress "can remain as such, proving that [Father] maintains and utilizes his support system and appl[ies] his knowledge of addiction to his

drug-free lifestyle." STOP Letter, 5/1/17. However, there also is a progress report from STOP, dated March 2017, noting that Father "is not sober[,] is using marijuana as a buffer to suppress his anxiety instead [of] medication . . . [and] he needs to understand that marijuana is also [a] drug and he is on probation. He does have mental health issues he needs to deal with and he is not being truthful with himself." STOP Preview Progress Note, 3/30/17, at 1.

At the termination hearing, Jared Burr, Father's CUA case manager, testified that Father has been very inconsistent with his weekly, supervised visits with Children, refused to have supervised visits at DHS, and has continued to test positive for marijuana, thus necessitating that the visits be supervised. N.T. Termination Hearing, 5/23/17, at 15. Mr. Burr also testified that while Father had showed him several homes, DHS would not clear them because they lacked basic essentials for Children (i.e., smoke detectors, food, operable utilities). *Id.* at 23-24. Finally, Mr. Burr testified that Father continues to have anger-management issues, has failed to complete an anger-management evaluation/assessment, has not completed court-ordered mental health and substance abuse treatment at STOP, and continues to break the law. *Id.* at 8-14.

Erica G. Williams, PsyD, testified at the termination hearing that Father's refusal to visit with Children due to the visits being supervised was a deleterious pattern of behavior. *Id.* at 46. Dr. Williams opined that Father's chronic substance abuse, criminal behavior, constant probation violations, and

lack of financial means and housing were factors that indicate Father is not capable of providing safety and permanence for Children.[6] *Id.* at 46-47. Dr. Williams also performed a formal bonding evaluation, a specialized assessment with the goal of determining the nature of Children's attachment to Father, and determined Father's lack of presence in Children's lives indicates he is not capable of meeting their day-to-day needs and that children in general are not able to emotionally thrive without a continuous and close relationship with their primary caregiver. Report of Forensic Evaluation: Bonding Evaluation by Erica G. Williams, PsyD, 11/17/16, at 7-8.

After carefully reviewing the parties' briefs, relevant case law and the certified record on appeal, we conclude that the through 31-page opinion authored by the Honorable Allan L. Tereshko adequately disposes of Father's issues on appeal. We agree that termination of Father's parental rights to

_____

[6] Father is correct that Dr. Williams noted there was a parent-child bond between Father and Children, that Children identified him as their biological father, and that they enjoyed their time with him. N.T. Termination Hearing, 5/23/17, at 50. However, Dr. Williams also testified that, due to Father's repeated incarcerations and continued arrests, they have only spent intermittent time with him. *Id.* As a result, she did not think that they would suffer irreparable harm were his rights terminated, as Father does not play a central role in their lives. *Id.* at 50-51. In addition, Mr. Burr testified that he could not say there is a current parent-child bond. *Id.* at 19. However, he also testified that the Children would not be irreparably harmed if Father's rights were terminated. *Id.* Finally, Children have bonded with their foster parent, a pre-adoptive resource, and have thrived in her care while she has provided for Children's educational, behavioral and cognitive needs. *Id.* at 17, 19.

J-S79017-17

Children, pursuant to sections 2511(a)(2)[7] and (b),[8] was in their best interest and is supported by record evidence. We direct the parties to attach a copy of Judge Tereshko's opinion in the event of further proceedings in the matter.

Order affirmed.

---

[7] Pursuant to 23 Pa.C.S. § 2511(a)(2)(a):

   (a)   General rule. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds

         (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

[8] Pursuant to 23 Pa.C.S. § 2511(b):

   (b)   Other considerations. — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/2017

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | FAMILY COURT DIVISION |
| | : | JUVENILE BRANCH - DEPENDENCY |
| | : | |
| P.K.K., Jr., a Minor | : | CP-51-AP-0000668-2014/CP-51-DP-0000993-2013 |
| d/o/b: 7. /2008 | : | |
| | : | |
| J.Z.K, a Minor | : | CP-51-AP0000669-2014/CP-51-DP-0000994-2013 |
| d/o/b: 3. /2010 | : | |
| | : | |
| | : | Superior Court No. |
| Appeal of: | : | 1933 EDA 2017/1934 EDA 2017 |
| P.K.K.., Father | : | Consolidated[1] |

## OPINION

## INTRODUCTION

P.K.K. ("Father"), Appeals from the Decree and Orders entered by this Court on May 23, 2017, granting the Petitions to Involuntarily Terminate Father's Parental Rights to his two minor male ("Children"), P.K.K., Jr., (d/o/b July 2008), and J.Z.K, (d/o/b March . 2010), and changing the Children's Permanency Goal to Adoption, filed by the Department of Human Services ("DHS") on November 22, 2016, and served on all parties.[2]

---

[1] 7/11/2017-Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeal at Nos. 1993 and 1934 EDA 2017 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

[2] Mother, R.C.J.'s parental rights were Involuntarily Terminated by this Court on 3/07/2016. Mother filed an appeal to this order on 4/06/2016: 1152 EDA 2016 and 1152 EDA 2016. This Court's decision was affirmed by The Superior Court of Pennsylvania on 1/09/2017.

1

After a full Hearing on the merits of the Petitions on May 23, 2017, this Court found that clear and convincing evidence was presented to terminate the parental rights of Father.

In response to the Decree and Order of May 23, 2017, terminating his parental rights, Father, by and through his counsel, filed a Notice of Appeal with Statement of Matters Complained of on Appeal on June 21, 2017.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In his Statement of Matters Complained of on Appeal, Father raises the following issues:

1. There was not clear and convincing evidence to support termination of parental rights due to the fact that Father had fairly consistent weekly visits with his Children and the visits were appropriate;
2. There was not clear and convincing evidence to support termination of parental rights due to the fact that Father has appropriate housing;
3. There was not clear and convincing evidence to support termination of parental rights due to the fact that Mother was in treatment for Mental Health and Drug and Alcohol.

## PROCEDURAL HISTORY

The Mother of the two male Children, P.K.K., Jr., born 7/7/2008, and J.Z.K., born 3/ 2010, is R.C.J. Mother's parental rights were involuntarily terminated as to the Children on March 7, 2016, by the Honorable Allan L. Tereshko. (Findings of Fact and Conclusions of Law, DHS Petition for Involuntary Termination of Parental Rights, 11/22/2016, ¶2.,3.).

2

The putative/natural/presumptive Father of the Children is P.K.K. (Findings of Fact and Conclusions of Law, DHS Petition for Involuntary Termination of Parental Rights, 11/22/2016, ¶4.).

On May 11, 2013, DHS received a General Protective Services (GPS) Report which alleged that Mother was wandering the street with her Children, while high on "wet". It was alleged that Mother was taken to Albert Einstein Medical Center (AEMC) and when medically cleared, she would be transferred to the Germantown Crisis Response Center (CRC). The Children were transported to DHS by the police. It was alleged that when Mother was found, she had no identification; however, upon arrival at AEMC, she was able to be identified by hospital staff. Mother had allegedly been taken to AEMC previously with the same condition. It was alleged the Children appeared healthy and that P.K.K., Jr. was able to confirm his name and J.Z.K.'s name. The Children presented fearful at the hospital and J.Z.K. had a soiled diaper. Attempts were made to reach the Children's Maternal Grandmother, C.W., however, the telephone calls went directly to voicemail. DHS located a temporary residence for the Children at Baring House until DHS was able to locate an appropriate placement for the Children. This Report is substantiated. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "a").

On May 13, 2013, Mother arrived at DHS after her discharge from the CRC. She denied illegal drug use. Mother further stated that she was diagnosed as suffering from anxiety, depression, and bipolar disorder and prescribed clonazepam and lamotrigine. Mother stated that she was taken to AEMC after she felt hot in a store with the Children

3

and she left the store sweating. Mother stated the next thing she remembered was that she was being transported to the hospital in the ambulance. Mother reported fainting in the ambulance. Mother stated that she took a drug test at the hospital and she was only positive for her prescribed medications. The Children's Father, P.K.K., called Mother while she was at DHS. DHS attempted to speak with Father; however, when DHS picked up the telephone, Father was no longer on the line. Father did not call back. Mother was unable to provide a viable placement resource for the Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "b").

On May 13, 2013, DHS obtained an OPC for the Children after locating a foster home through Children's Choice. The Children remain in placement. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "c").

A Shelter Care Hearing was held on May 15, 2013, before the Honorable Allan L. Tereshko. The Court lifted the temporary OPC, ordered the temporary commitment to DHS to stand. Children to be medically assessed for services. DHS to refer P.K.K., Jr., to Elwyn for evaluation and J.Z.K. to Child Link. Mother referred to the Clinical Evaluation Unit (CEU) for a forthwith drug screen, an assessment, and monitoring. DHS to do home evaluation as to Mother and Maternal Grandmother's residence. DHS to confirm if Mother was taken to Germantown CRC. (Shelter Care Order, 5/15/2013).

An Adjudicatory Hearing was held on May 21, 2013, before the Honorable Allan Tereshko. The Court discharged the temporary commitment, adjudicated the Children Dependent and committed them to DHS, and placement in Foster Care. The Court

4

ordered that a Family Service Plan (FSP) meeting be held within 30 days; that Mother be granted weekly supervised visits with the Children at the Agency; that Father be granted supervised visits at Hoffman Hall as arranged by the parties; that all visits may be modified by agreement of the parties; that Mother continue with her treatment through Community Organization for Mental Health and Retardation (COMHAR); that Mother comply with the scheduled appointment with CEU on June 4, 2013; and that Mother be re-referred to CEU for a forthwith drug screen and monitoring. (Orders of Adjudication and Disposition – Child Dependent, 5/21/2013).

On August 20, 2013, CEU submitted a Report of Non-Compliance as to Mother, which stated that Mother was evaluated on June 4, 2013 by CEU; that the treatment recommendation was for Mother to attend short term dual diagnosis treatment; that CEU schedule Mother for an intake appointment at Gaudenzia Together House for Women on July 17, 2013; that Mother failed to attend the intake appointment; and that Mother had not contacted Guadenzia or CEU for assistance with engaging in treatment. The Report further stated Mother's drug screen on May 15, 2013, was positive for phencyclidine (PCP); that her drug screen on May 21, 2013 was positive for PCP and marijuana; and that her drug screen on June 4, 2013 was positive for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "f").

A Permanency Review Hearing was held on August 22, 2013 before Juvenile Master Carson. An Order was issued that legal custody to remain with DHS, and placement of the Children shall remain in Foster Care through Children's Choice. Mother was referred to the Achieving Reunification Center (ARC); that she attend mental

5

health therapy; and that the CEU Report of Non-Compliance as to Mother was incorporated into the Record by reference. P.K.K., Jr., will be staring kindergarten at Howe School, and Mother to request an IEP. J.Z.K. will have an evaluation on 10/14/2013, for speech therapy, and Mother to request an IEP. Mother's visits modified to twice weekly for two hours, if appropriate, and that Mother be referred to CEU. (Permanency Review Orders, 8/22/2013).

On November 4, 2013, ARC submitted a Closing Letter regarding Father. The letter stated that Father had missed Orientation and Intake appointment; that he had been non-responsive to all ARC outreach efforts; that on October 28, 2014, he scheduled an Intake appointment for November 2, 2013; that Father did not report as scheduled to this appointment; and that ARC was closing outreach efforts to Father. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "h").

On November 19, 2013, CEU submitted a Report as to Mother, which stated that Mother was successfully discharged from treatment at Gaudenzia on September 20, 2013; that she had been transferred to the Women's Co-occurring program; and that CEU had been unable to obtain any further information regarding Mother's treatment progress. The Report also stated that Mother's drug screen on August 22, 2013, was positive for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "i").

A Permanency Review Hearing was held on November 21, 2013, before Master Carson. It was ordered that legal custody of the Children to remain with DHS, and placement to remain in Foster Care through Children's Choice. P.K.K., Jr., attends Howe

6

Elementary School and attends JJPI for therapy. He is struggling academically and was referred for an IEP on 11/13/2013. J.Z.K. also attends Howe Elementary School and receives speech therapy through Elwyn. Both Children are safe as of 11/19/2013. Mother to return to ARC, and re-referred to CEU for a forthwith drug screen, assessment, and monitoring if appropriate. Mother to continue weekly supervised visits at the Agency. Father referred to CEU for a forthwith drug screen, assessment and monitoring, if appropriate. Parent's visits are to continue as arranged. DHS to explore Paternal Grandparents as visiting sources. Parents authorized to have extended visits for Thanksgiving and Christmas. (Permanency Review Orders, 11/21/2013).

On February 17, 2014, CEU submitted a Report of Non-Compliance as to Mother, which stated that Mother was unable to stay for her court ordered drug and alcohol assessment on November 21, 2013; that Mother rescheduled the appointment for December 30, 2013; and that Mother was a no call/no show for her December 30, 2013 appointment. Mother's drug screen on November 21, 2013 was again positive for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "k").

On February 17, 2014, CEU submitted a Report of Non-Compliance as to Father, which stated that Father was unable to stay for his court ordered drug and alcohol assessment on November 21, 2013; that Father rescheduled the appointment for December 30, 2013; and that Father was a no call/no show for his December 30, 2013 appointment. Father's drug screen on November 21, 2013 was positive for PCP and marijuana. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "l").

7

A continuance was granted on February 20, 2014, as no Master was available to hear the case. (Continuance Orders, 2/20/2014).

A continuance was granted on February 28, 2014, for case to be heard by a Judge. Status quo remains. (Continuance Orders, 2/28/2014).

A Permanency Review Hearing was held on March 18, 2014, before the Honorable Allan L. Tereshko. Legal custody of the Children to remain with DHS, and placement to continue in Foster Care through Children's Choice. Both Children doing well. Mother had made 17 out of 22 visits, and Father had made 19 out of 22 visits. Mother and Father's visits were not to be separate. If Father's drug screen is negative prior to next court date, his visits may be modified to unsupervised day community visits. Mother re-referred to ARC, and referred to CEU for an assessment and forthwith drug screen. Father referred to CEU for a forthwith drug screen and one random drug screen prior to the next court date. (Permanency Review Orders, 3/18/2014).

On May 14, 2014, DHS held an FSP meeting. The parental objectives established for Mother were to locate and occupy suitable housing for family with suitable space, heat, and all other operable utilities; to participate in a mental health evaluation; to comply with all treatment recommendations including therapy and or medication as prescribed; to sign an authorization to allow DHS to obtain copies of evaluations and progress reports; to participate in an evaluation for drug and alcohol abuse; to comply with all treatment recommendations of the provider; to keep all visits and maintain regular contact with the Children; to meet regularly with the agency social worker and follow through with her Individual Service Plan (ISP); to meet with an instructor on a weekly basis to learn expected behavior for the Children; to set age appropriate

8

expectations; to participate in the evaluation and recommended treatment for the Children; and to sign an authorization to allow DHS to obtain medical records and reports regarding the Children. The parental objectives established for Father were to locate and occupy suitable housing for family with suitable space, heat, and all other operable utilities; to participate in an evaluation for drug and alcohol abuse; to comply with all treatment recommendations of the provider; to keep all visits and maintain regular contact with the Children; to meet regularly with the agency social worker and follow through with his ISP; to participate in the evaluation and recommended treatment for the Children; and to sign an authorization to allow DHS to obtain medical records and reports regarding the Children. Both Mother and Father failed to participate in the FSP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "n").

On June 9, 2014, CEU submitted a Report as to Mother, which stated that Mother was unable to stay for her court ordered drug and alcohol assessment on March 18, 2014; that Mother rescheduled the appointment for April 4, 2014 and May 6, 2014; and that Mother was a no call/no show for her May 6, 2014 appointment. Mother's drug screen on March 18, 2014 was positive again for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "o").

A Permanency Review Hearing was held on June 10, 2014, before the Honorable Vincent L. Johnson. Legal custody of the Children remains with DHS, and placement to continue in Foster Care through Children's Choice. Both Children doing well. Father is permitted unsupervised day visits in the community as arranged by the parties, which

9

may be modified to overnights once Father participates in P.K.K., Jr.'s therapy. Father receives mental health services, and drug and alcohol counseling through STOP. Father to participate in P.K.K, Jr.'s therapy. DHS to do home assessment on Father's house. Mother receives mental health services through COMHAR, and she was referred to Sobriety Through Out Patient, Inc. (STOP) for drug and alcohol counseling. Mother attended the STOP Intake Appointment on May 14, 2014, and had not returned to STOP since the Intake Appointment. Mother re-referred to CEU for an evaluation and a forthwith full drug screen. Mother and Father to comply with all FSP objectives, services, and recommendations. (Permanency Review Orders, 6/10/2014).

Father is currently on probation as a result of his arrest on drug-related charges on May 16, 2012, to which he pled guilty on November 1, 2012, and sentenced to 6-23 months of confinement followed by 3 years of probation. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "q").

On August 18, 2014, DHS learned that Father's drug screen on July 14, 2014, was positive for high levels of marijuana and that he had missed his scheduled office visit on August 11, 2014 with his Probation Officer and was currently in Violation Status with Probation. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "r").

On August 28, 2014, CEU submitted a Report as to Mother, which stated that Mother was unable to stay for her court ordered drug and alcohol assessment on June 10, 2014. Mother rescheduled the appointment for July 2, 2014, and that Mother was a no call/no show for her July 2, 2014, appointment. Mother's drug screen on June 10, 2014,

was positive for PCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "s").

On August 29, 2014, the Joseph J. Peters Institute (JJPI) submitted a letter to DHS stating that there were concerns regarding P.K.K., Jr's., therapy and Father's developing a pattern of either missing appointments without notification (no call/no show), or of rescheduling appointments. The letter stated that Father cancelled the appointment on August 4, 2014; that it was rescheduled for August 6, 2014, which he and P.K.K., Jr. attended; that Father was no call/no show for the appointment on August 11, 2014; that JJPI telephoned Father regarding this no call/no show, and that Father requested that the appointment be rescheduled; appointment was rescheduled to August 14, 2014; that Father was no call/no show for the appointment on August 14, 2014; that JJPI telephoned Father regarding this no call/no show, and that Father stated he was in a lot of pain and would not be able to attend therapy that day; that Father and Child did attend the appointment on August 18, 2014; that Father was no call/no show for the appointment on August 25, 2014; the appointment be rescheduled to August 29, 2014, which was then rescheduled to August 28, 2014, which Father was a no call/no show for that appointment; that JJPI telephoned Father regarding this no call/no show, and that Father stated he was in a lot of pain. The letter further stated that JJPI was concerned about the Child, as it is essential for the Child to maintain consistency in therapy in order to ensure therapeutic progress. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "t").

A Permanency Review Hearing was held on September 2, 2014, before Master Campbell. Legal custody of the Children to remain with DHS, and placement remains in

11

Foster Care through Wordsworth. Father's visits are now modified to supervised at the Agency. Mother's visits supervised at the Agency. Mother and Father re-referred to CEU for a drug screen and monitoring, when they avail themselves. (Permanency Review Orders, 9/02/2014).

On September 19, 2014, DHS and Community Umbrella Agency (CUA) Wordsworth held a Single Case Plan (SCP) meeting. The parental objectives established for Mother were to continue to attend weekly supervised visits and contact the Case Manager if she will be late or unable to attend; to re-engage with STOP or other Behavioral Health Services (BHS), to have her drug and alcohol counseling and/or therapeutic needs met; and to continue to attend ARC and complete parenting and anger management courses. The parental objectives established for Father were to schedule times with the Case Manager to conduct home assessments and clearances of any individuals currently living in the home; to continue to attend JJPI therapy sessions with P.K.K., Jr.; and to continue to meet with his Probation Officer on a weekly basis. Both Mother and Father participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "v").

A Permanency Review Hearing was held on December 16, 2014, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, and placement remains in Foster Care. Pending a negative drug screen, Father shall have unsupervised community visitation with the Children. Supervised visitation with Mother shall continue at the Agency. Father is to begin parent child interaction therapy once

12

scheduled. Father is referred to CEU for an assessment and a forthwith drug screen. (Permanency Review Orders, 12/16/2014).

A Permanency Review Hearing was held on March 17, 2015, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, and placement remains in Foster Care through Children's Choice. Both Children doing well in placement. CUA Wordsworth did explore Father's home and found it was not appropriate. Mother was referred to ARC for services and did not comply. Mother is complying with Mental Health Services through COHMAR and complying with supervised visitation schedule. Father is in minimal compliance with permanency plan, in that Father receives individual and group therapy through STOP, and is complying with those services. Father is non-compliant with other Single Case Plans, Objectives and Recommendations. Report submitted to the Court from CEU for Father. The Court also found that J.Z.K. is doing well, receiving Developmental Delay/Speech Therapy. P.K.K., Jr., receives current learning support for reading and math. (Permanency Review Orders, 3/17/2015).

A Permanency Review Hearing was held on June 30, 2015, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, and placement remains in Foster Care through Children's Choice. Children are doing well in placement. P.K.K., Jr., has a current IEP. J.Z.K receives speech therapy. Father is currently incarcerated at House of Corrections. The Court granted request for matters to be continued to allow Father to be brought down for next listing. Mother is referred to CEU for forthwith drug screen prior to the next court date. (Permanency Review Orders, 6/30/2015).

13

On August 26, 2015, CUA held an SCP meeting. Father's parental objectives were to work with CUA regarding scheduling time for CUA to assess the safety of his home and to obtain clearances for any individuals other than Father residing in the home; to complete PHMC application for household furniture; to enroll in and participate with the Children in Parent Child interaction therapy and comply with all recommendations; to cooperate with his Probation Officer in order to remain out of incarceration; to coordinate with CUA regarding supervised visitation; to continue attending individual and group therapy at STOP; and to sign all releases and provide documentation of therapy at STOP. Father participated in the meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "y").

A Permanency Review Hearing was held on November 17, 2015, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, and placement remains in Foster Care. After four successful supervised visits with the Children, Father's visits may then be modified back to unsupervised before next court date. Case remains status quo, and next listing is 3/07/2016. (Permanency Review Orders, 11/17/2015).

A Contested Goal Change and Permanency Review Hearing was held on March 7, 2016, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, and placement remains in Foster Care. Mother's parental rights were involuntarily terminated. Father's visitation to continue as arranged, and Father's wife's home to be evaluated and clearances to be conducted. If appropriate, then visitation with the Children can take place in home of F.B.,    N. 7th St., Philadelphia, PA. A bonding evaluation is ordered for Father. (Permanency Review Orders, 3/07/2016).

14

A Permanency Review Hearing was held on May 26, 2016, before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, and placement remains in Foster Care. Status Quo to remain, and case continued. (Permanency Review Orders, 5/26/2016).

On August 9, 2016, CUA held an SCP meeting. The parental objectives for Father were to participate in Parent Child Interaction Therapy; to utilize techniques and skills taught to improve interaction and parenting; to provide CUA with progress report; to complete PHMC and provide CUA with documentation to secure funds to obtain a larger home; to continue to meet with Probation Officer and maintain compliance with the terms of his probation; to continue individual and group therapy at STOP; to sign releases of information and provide documentation of drug treatment therapy at STOP; and to coordinate with CUA regarding unsupervised community visitation. Father participated in the meeting via telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "bb").

A Permanency Review Hearing was held on August 25, 2016, before the Honorable Richard J. Gordon. Legal custody of the Children remains with DHS, and placement remains in Foster Care. Father to have line of sight/line of hearing supervised visits with Children as arranged. Father has a bonding evaluation scheduled for 9/06/2016, and he is receiving drug and alcohol treatment at STOP. Father is referred to CEU forthwith for drug screen, monitoring and 3 random drug screens prior to next court date. Father to comply with bonding evaluation. CUA to ensure Children attend medical appointments. (Permanency Review Orders, 8/25/2016).

15

A CUA Permanency Review hearing was listed on November 17, 2016, before a Master. Forensic Mental Health Services, LLC, submitted a Parenting Capacity Evaluation (PCE) as to Father, conducted by Dr. Erica G. Williams and Samantha Peterson, M.A. The PCE stated that, at this time, based on the available information, Father does not present with the capacity to provide safety and/or permanency to the Children. The PCE noted that there are currently multiple barriers to Father demonstrating the capacity to provide safety and/or permanency to the Children; Father has a chronic history of ongoing criminal behaviors resulting in contact with law enforcement, arrests, violation of supervision, and incarceration; that this includes engaging in criminal behavior resulting in his arrest while the Children were in his care; that he does not take responsibility for his criminal behaviors, projects blame on others, and reports he "beat" his cases; that he was a general and provided minimal details when queried about recent criminal violations; that records indicate he has a history of non-compliance with objectives identified to support reunification, despite being in the community and able to complete them; that there is a history of Father missing and not complying with the therapy set up for P.K.K., Jr. and him; and that he has not reengaged in the therapy despite being requested to do so. The evaluation further noted that Father admitted to a history of using marijuana only; that records indicate he has a history of using PCP; that Father stated he used marijuana as a coping mechanism; that he has not attended his last three visits with the Children, despite confirming the visits; that he does not currently have housing secured and there are reports he has been misleading regarding housing in the past; that the Children have been in placement for over three years; that during this time, he has not demonstrated an ability and/or willingness to

16

refrain from criminal behavior, drug use, or to comply with objectives identified for him, and/or demonstrate consistent visitation when in the community and able to visit; and that he continues to engage in behavior, such as use of marijuana, that violates his current supervision and can again result in his incarceration. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/22/2016, ¶ "dd").

A continuance was granted on November 17, 2016, as parties requested a hearing before a Judge. (Continuance Orders, 11/17/2016).

A continuance was granted on December 8, 2016, due to time constraints. Father referred to CEU forthwith for a full drug and alcohol screen, dual diagnosis, monitoring and 3 randoms prior to next court date. (Continuance Orders, 12/08/2016).

A continuance was granted on January 20, 2017, as case worker did not appear and witnesses were not available. Case to remain status quo. (Status Review Orders, 1/20/2017).

## TERMINATION HEARING

On May 23, 2017, this Court held a Goal Change/Termination Hearing and heard testimony on DHS's Petition to Terminate Father's Paternal Rights as to his Children, and Change the Permanency Goal to Adoption. Father was present and represented by his attorney, Shanese Johnson. (N.T. 5/23/2017, p.3 at 12-14).

Michael Pratt, the Assistant City Solicitor, called his first witness, Jared Burr, the CUA Case Manager from Wordsworth 5. He testified the Children came into care on May 11, 2013, because Mother was found under the influence of PCP in the community

17

while she was having one of her visits with the boys. No kin were identified and thus the Children were placed in general foster care. At that point Father's whereabouts were unknown. (N.T. 5/23/2017, p.6 at 13-25; p.7 at 1-2).

He testified an OPC was obtained on 5/13/2013, and Father was made aware of the situation at that time by Mother's telephone call. It was later learned that Father was incarcerated at that time.[3] (N.T. 5/23/2017, p.7 at 4-10).

Mr. Burr testified the case was adjudicated on 5/21/2013, and Father participated in many single case plan meetings. Father had as an objective to comply with drug and alcohol services, and he was referred to CEU for assessment and random screens. Mr. Burr listed dates that Father was court ordered for drug screen that he did not attend: 11/21/2013, 3/18/2014, 9/2/2014, 12/16/2014, and 8/25/2016. Father did attend forthwith drug screens on 11/12/2013 (tested positive for PCP and marijuana), 7/14/2014 (tested positive for marijuana), 8/25/2016 (tested positive for marijuana), 9/20/2016 (tested positive for marijuana), and 12/08/2016 (tested positive for marijuana). Mr. Burr's progress note dated 3/30/2017 noted that Father is not sober and is using marijuana to suppress his anxiety regardless of being on probation. Father does not believe he has an issue and is in denial. Father has never completed substance abuse treatment and that it remains an outstanding objective. (N.T. 5/23/2017, p.7 at 4-14; p.8 at 12-25; p.9 at 1-25; p.10 at 1-25; p.11 at 1-17).

Mr. Burr also testified Father was ordered to attend parent child interaction therapy as of 12/07/2014. Father completed JJPI therapy, and the discharge

---

[3]Secure Court Summary, p. 2: CP-51-CR-0009219-2012-Disposition 11/01/2012: Manufacture, Deliver, or Possession With Intent to Manufacture or Deliver, 35 §780-113 §§A30-Guilty Pleas -- Negotiated: Confinement: 6-23 months.

18

recommendation was for parent child interaction therapy. Father did not participate in that therapy until August 2016. (N.T. 5/23/2017, p.11 at 18-25; p.12 at 1-9).

Mr. Burr noted Father does not take accountability for his actions, blaming him and others for his lack of progress throughout this whole case. Father was demanding, uncooperative, rude, and also has a long criminal history. Recently Father blamed him for his marijuana use and admitted that he still presently smokes marijuana. (N.T. 5/23/2017, p.8 at 4-11; p.12 at 13-25).

Father continues to be unemployed, and continues to reside with his Paternal Grandmother. Regarding weekly supervised visitation at the Agency, Father has been very inconsistent. He has strings of compliance and attendance, then he misses quite a few visits. In September 2016, Father refused to have the supervised visits at the Agency, because he wanted to have unsupervised community visits back, however, he always tested positive for marijuana and supervised visits were ordered. (N.T. 5/23/2017, p.14 at 3-25; p.15 at 1-5).

Mr. Burr opined that the best outcome for the Children is for them to be adopted because Father does not have the capacity to provide for the safety of his Children. Throughout the four years that the Children have been in care, Father has failed to consistently visit, plan for, provide for the boys, and failed to show throughout this time to be self-sufficient enough to be a primary care giver. He is far too dependent on others to do things for him. He lacks urgency, assertiveness, and lacks an awareness of his Children. He cannot explain what their needs are, nor what services are needed. He minimizes his criminal behavior. (N.T. 5/23/2017, p.16 at 1-25).

19

Regarding the foster parent, R.C., Mr. Burr noted that the Children were placed with her in May 2013, and she has been the primary caregiver for them. She has been a strong advocate for the boys, and has brought the Children's physical ailments and issues to my attention. She has shown the assertiveness and the ability to care for them. Both boys have shown a great deal of progress, educationally, and therapeutically. He believes the Children would not suffer irreparable harm if Father's parental rights were terminated because the Children are bonded to the foster parent and have shown much progress in her care. He opined it is in the Children's best interest to be adopted. (N.T. 5/23/2017, p. 17 at 7-25; p.18 at 1-25; p.19 at 7-25).

On cross-examination by James Martin, attorney for the Children, Mr. Burr noted that Father was court ordered to obtain a parenting capacity evaluation, which resulted in the conclusion that Father needed mental health treatment. He also noted that Father has presented approximately four homes that the Agency has tried to clear, however, we found out he left those homes or some lacked the basic essentials such as operable utilities, smoke detectors, food, etc. He noted Father was on disability and that was his source of income. (N.T. 5/23/2017, p.20 at 21-25; p.21 at 1-25; p.22 at 1-1; p.24 at 1-12).

Mr. Burr noted that Father obtained certificates for anger management and parenting in 2013 while he was incarcerated, however, he believes Father continues to have anger management issues. He further noted that Father was referred to CEU for evaluation five times, but Father never completed an assessment, and he had at least 5 positive drug results. Further, Father continues to actively use drugs as of March 30, 2017, which was documented on a progress note from STOP. He noted that Father was

20

referred to STOP for mental health and substance abuse, but Father never completed that treatment. (N.T. 5/23/2017, p.26 at 4-25; p.27 at 1-18; p.28 at 1-12).

Erica Williams, Psychologist, from Forensic Mental Health Services, was next to testify. She testified she conducted a Parenting Capacity Evaluation on November 17, 2016, and reviewed case summaries from CUA, court records, an IEP evaluation for one of the Children, narratives that brought the case into care, and the statement of facts that was produced. (N.T. 5/23/2017, p.43 at 4-23).

Dr. Williams testified when completing a Parenting Capacity Evaluation, she is focused on the safety and permanency for the Children. In this case, she reviewed all the data provided as well as Father's criminal history, his substance abuse history, and his interactions and understanding of the Children's needs. (N.T. 5/23/2017, p.45 at 3-18).

Father identified a history ADHD as well as a diagnosis of depression. He reported chronic use of marijuana, with instances of use of PCP. She determined that Father did not present with the capacity to provide safety or permanence for his Children. There were multiple layers of concern, the most being his criminal behavior, substance abuse, and consistent violation of probation. These factors led him to be inconsistent in the contact with his Children, and also caused him to be arrested in their presence. Father identifies drug use as a coping mechanism. (N.T. 5/23/2017, p.46 at 2-25; p.47 at 1-2).

Dr. Williams testified she was concerned that Father refused to visit with his Children because he disagreed with the level of supervision. He would confirm but not show up for the visits. This was another pattern of behavior which caused him to not be present in the Children's lives, which cause significant concerns for permanency as well as over-arching safety concerns. (N.T. 5/23/2017, p.47 at 6-19).

21

Dr. Williams also discussed a prior bonding evaluation, which she conducted after a review of all materials, an interview with Father, and an observation of the Children with him. She observed that the Children were comfortable with their Father, they enjoyed his presence. They were able to interact throughout the visit without any observed concerns. She noted she observed a bond with the Children at the time, and they identified him as their Father. However, the contact between them was always intermittent. Father was never the central caregiver, and his contact was unpredictable and inconsistent throughout the years. (N.T. 5/23/2017, p.48 at 18-25; p.49 at 10-25).

Dr. Williams opined that there was no reason to think that the Children not having contact with their Father would cause them to be incapable of attachment with another adult or having healthy relationships as they grow up. If contact with Father were to cease, the Children would not suffer irreparable harm. (N.T. 5/23/2017, p.51 at 2-25).

On cross-examination by James Martin, the GAL, Dr. Williams opined that Father cannot ensure safety because he is abusing substances and permanency is threatened. Father dismissed and minimized the majority of his criminal history. He had a substantial juvenile criminal history and it carried over into his adult life. There were no times of freedom when he was not incarcerated, out on probation, and there was no substantial amount of time that he was not engaged in criminalized behaviors. Father presented as confused and not quite understanding why the Children were not returned to him, and could not see that his behavior was the cause. (N.T. 5/23/2017, p.53 at 5-25; p.54 at 1-20).

Dr. Williams noted in the Evaluation which was conducted on November 17, 2016, she recommended Father obtain further treatment for mental health, and

22

recommended Father abstain from drugs, criminal behavior, and not to violate his probation. After Mr. Martin noted that Father had tested positive for drugs on 12/8/2016 basically right after the Parenting Capacity Evaluation, Dr. Williams stated that all of her concerns regarding Father remain to this day. (N.T. 5/23/2017, p.55 at 5-25; p.56 at 1-12).

On cross-examination by Lee Schwartzberg, the Child Advocate, Dr. Williams opined that Father is not executing the necessary skills to care for himself, he is not able to demonstrate substance free time, and he is not able to ensure his own safety and permanency. Therefore, he could not absolutely provide for the developmental, physical and emotional safety and permanency of his Children. (N.T. 5/23/2017, p.56 at 15-25; p.57 at 1-25).

Father was the next to testify, called as an adverse witness by Mr. Martin, the GAL. Father noted the case has been open for four years. He stated he lives at 2 ... W. Silver Street, his Great Grandmother's house. He states this house is appropriate for reunification with his Children. Father claims the drug screen on November of 2013 was tampered with because he never used PCP. He did state he tested positive for marijuana in August 2016, however, could not recall drug tests in November or December of 2016. Father claims he was compliant with the drug program that he entered in 2015, after he dropped out then returned. Father claims he was in compliance with the mental health program at STOP from January through June 2016, and was taking Wellbutrin for depression. (N.T. 5/23/2017, p.61 at 1-11; p.64 at 21-25; p.69 at 7-25; p.70 at 11-13; p.71 at 6-19; p.72 at 20-22).

23

Father testified he receives full disability payments, and works 20 hours per week. He works at E___ P:__ P:__ for 10 hours per week, and at T:__ T.__ for 6 hours per week. He stated he has bedding ready for the Children at his house. (N.T. 5/23/2017, p.74 at 20-25; p.75 at 1-19; p.76 at 18-25).

On direct examination by his attorney, Ms. Johnson, Father noted that he attends STOP twice a week, and has bedding available at the house where he lives. He states he is in compliance with his probation. Father stated he does not want his rights terminated because he has done everything that was asked of him. (N.T. 5/23/2017, p.78 at 10-25; p.79 at 1-6; p.83 at 17-25; p.84 at 18-19).

On cross-examination by Mr. Pratt, counsel for DHS, Father agreed he appeared for court on December 8, 2016, and the case was continued. He did not agree with the document presented by DHS that showed Father had tested positive for marijuana on that date. Father said the report was inaccurate. (N.T. 5/23/2017, p.85 at 9-25; p.86 at 1-25; p.87 at 1).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as

24

to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* 91 A.3d 197 Pa.Super.2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007)

25

(citations omitted). In re Adoption of C.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

### A. The Trial Court Properly Found the Department of Human Services Met Its Burden by Clear and Convincing Evidence To Terminate Father's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), and (2)[4]

This Court found clear and convincing evidence to terminate Father's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), and (2).

Father alleges that he had fairly consistent weekly visits with his Children, and the visits were appropriate. The Record reflects a different reality. Dr. Erica Williams, Psychologist from Forensic Mental Health Services, testified she was concerned that

---

[4] 1(a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

26

Father refused to visit with his Children because he disagreed with the level of supervision. He would confirm but not show up for the visits. This was another pattern of behavior which caused him to not be present in the Children's lives, and which caused significant concerns for permanency as well as over-arching safety concerns.

Father next alleges he had appropriate housing for his Children. Again, the Record reflects a different story. Mr. Burr, the CUA Case Manager, testified that during his supervision, Father continued to be unemployed, and lived with his Paternal Grandmother. Father was incarcerated at the time the Children came into care, and was also in and out of jail during the four-year period since that time. Father, himself, testified he currently lives with his Great Grandmother.

Father's final assertion of trial court error asserts "Mother's" treatment for Mental Health and Drug and Alcohol issues. This Court will address Father's ongoing inability to resolve his substance abuse and mental health issues, not Mother's. Clear and convincing evidence was credibly presented that confirms Father's inability to refrain from drug use. Father consistently tested positive for marijuana use. He denied the use of PCP, which he tested positive for, and even denied the positive results of a drug test which was conducted after a court hearing on December 8, 2016.

After hearing the credible testimony of Mr. Burr, the Court found by clear and convincing evidence, that the observations and conclusions regarding Father's non-compliance with the FSP objectives, and lack of ability and or refusal to fulfill his parental responsibilities were persuasive.

The Court also found credible the expert testimony of Dr. Williams, the Psychologist from Forensic Mental Health Services, who conducted both a Bonding

27

Evaluation and a Parenting Capacity Evaluation of Father. She opined that Father was consistently and continuously using drugs, and was incapable of meeting his own needs and caring for himself, let alone providing safety and permanence for his Children. She noted the Children recognize Father as their parent, and enjoy his company during visits, however, he is incapable of providing the consistency and stability that the Children require.

At the hearing on March 7, 2016, this Court ordered a Bonding Evaluation, and was not inclined to terminate Father's parental rights at that time. The Court was aware of Father's drug issues, and gave Father an opportunity to build on the relationship he had with his Children. However, in over a year's time, Father has done nothing to remedy the situation and these issues remain the same today.

### B. Trial Court Properly Found that Termination of Father's Parental Rights was in the Children's Best Interest and that DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b).[5]

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court 'shall give primary consideration to the development, physical and emotional needs and welfare of the

---

[5] Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. In re T.S.M., 71 A3d.

The Court found credible the evidence of the CUA Case Manager that the Children were bonded to the foster parent and look to her for safety and to meet their needs. The Court also found credible the testimony of the Psychologist who opined that the Children needed the safety and security that Father cannot provide, and it would be in their best interest to be adopted. Therefore, this Court reasoned that the Children would not suffer irreparable harm if Father's parental rights were terminated, and it would be in their best interests to be adopted.

## CONCLUSION:

At the conclusion of the hearing the Court stated:

> There's a few things that at the outset I must resolve, and one of them obviously is the issue of credibility since there are major contradictions between the testimony of Father and the testimony of the witnesses, and some of those contradictions were pointed out during cross examination.
>
> And it appears that where there's an inconvenient fact facing Father he has a poor memory such as the one most recently alluded to where he came to court on a day where the goal change hearing was expected to be tried with marijuana in his bloodstream as indicated by the document admitted into evidence. Father's testimony is rife with these kinds of denials and inconsistencies such that Father has no credibility before the Court. And all of his testimony must be viewed in that light.
>
> On the other side of the equation I credit the case worker's testimony, give it great weight because he has been the case worker throughout the life of this case as I understand it.

29

And his testimony and record keeping was consistent. It was not shaken during cross examination. And I credit his testimony and give it great weight.

As I do with Dr. Williams who was very insightful into Father's character and how that character effects his ability to parent these Children going forward. Both the parenting evaluation and bonding evaluation support a finding by this Court that Father has no ability to parent these Children going forward because of his numerous personal issues and because of other factors that affect his ability to appreciate the needs of these Children both in the past and the needs of the Children going forward will prevent him from being able to parent these Children as their needs grow with age. He's not able to provide safety for the Children, he was not able to provide safety in the past, not able to appreciate the needs of the Children other than the limited needs of some fun during limited visitation which by the way has remained consistent for almost four years without change.

The issue of predictability in the Children's lives, the issue of providing for the future, the ability to plan, Father does not have that ability. He hasn't had it in the past and will mostly [likely] not be able to gain that skill going forward.

Father speaks of having three jobs and three separate incomes yet looks to the social services to provide him with things that would be necessary for the Children. He speaks of having a home but that home has never been provided as a resource, and the home was never cleared as a resource. The inconsistencies are rife throughout his testimony.

As to the bond, this was the issue that gave the Court pause at the last listing but I find that Father has done nothing in the intermediate term to remedy that issue. The bond stayed as it was, just a father figure, not able to provide parenting, in real time, will not be able to provide parenting going forward, and does not even appreciate what parenting means.

So that considering the evidence as a whole, the record clearly and convincingly supports a finding pursuant to 2511 (a) (1), and (2). The Children were not in his care when they were taken into care by DHS.

Further, the finding under 2511(b) is established clearly and convincingly that it would be in the best interest of

these Children to receive permanency, predictability, care, guidance, going forward which cannot be provided by Father, Father's rights are terminated accordingly, under 2511 (a)(1) and (2), and 2511(b).

(N.T. 5/23/2017, p.87 at 7-25; p.88 at 1-25; p.89 at 1-25; p.90 at 1-12).

For the foregoing reasons, this Court respectfully requests that the Order of May 23, 2017, Terminating Father, P.K.K.'s Parental Rights and changing the Children's Permanency Goals to Adoption be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

_7-27-17_
DATE

31